IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
Southern Division

| | |
|---|---|
| VISIONQUEST INDUSTRIES, INC. ) <br> ) <br>     Plaintiff, ) <br> ) <br> v. ) <br> ) <br> XAVIER BECERRA ) <br> SECRETARY OF THE UNITED STATES ) <br> DEPARTMENT OF HEALTH AND HUMAN ) <br> SERVICES ) <br> ) <br>     Defendant. ) | Civil Action No.:_____ |

## COMPLAINT FOR JUDICIAL REVIEW

Plaintiff, VisionQuest Industries, Inc. ("VisionQuest"), by and through its undersigned legal counsel, hereby files this Complaint against Defendant, Xavier Becerra, in his official capacity as the Secretary of the United States Department of Health and Human Services ("the Secretary"), seeking judicial review of the final agency decision rendered by the Medicare Appeals Council ("the Council") as to Council docket number M-23-4291 and M-23-4391 and ALJ appeal number 3-9848473877R1, and in support thereof states as follows:

**Parties**

1. VisionQuest is a corporation organized under the laws of the state of California. VisionQuest's principal place of business is located in Orange County, California at 3187 Redhill Avenue, Suite 150, Costa Mesa, CA 92626.

2. Defendant, Xavier Becerra, is the Secretary of the United States Department of Health and Human Services and the proper Defendant in this action pursuant to 42 C.F.R. § 405.1136(d)(1).

## Jurisdiction and Venue

3. Jurisdiction is proper pursuant to 42 U.S.C. § 1395ff(b), which authorizes judicial review of a final agency decision of the Secretary of the United States Department of Health and Human Services.

4. Venue is proper pursuant to 42 U.S.C. § 1395ff(b), as Plaintiff's principal place of business is located in this judicial district.

5. The amount in controversy exceeds the jurisdictional amount set forth in 42 U.S.C. § 1395ff(b)(E)(i).

6. This action has been commenced within 60 days of the final agency decision dated August 24, 2023, as mandated by 42 C.F.R. §§ 405.1130, 1136(c)(1).

## The Medicare Program

7. Medicare is a Federal health insurance program for the elderly and disabled that was established in 1965. The Medicare statute is codified at 42 U.S.C. § 1395 *et seq.*

8. The Medicare program is administered by the Secretary through the Centers for Medicare and Medicaid Services ("CMS"), which, in turn, contracts with private entities to perform certain functions on its behalf. These functions include, but are not limited to, processing claims for reimbursement submitted by Medicare providers and audits of such claims to ensure that they meet pertinent coverage and documentation requirements.

9. Medicare claims are processed by contractors known as Medicare Administrative Contractors ("MACs").

10. The Office of Inspector General ("OIG") performs independent reviews of U.S. Department of Health and Human Services ("HHS") programs pursuant to the Inspector General

Act of 1978, 5 U.S.C. App. § 4(a)(1). OIG, among other functions, performs independent post-payment audits of Medicare claims submitted by providers.

11. The Medicare statute contains general coverage requirements for qualifying items and services that are reimbursable under the program. Congress has delegated to the Secretary the authority, through CMS, to promulgate more specific criteria for Medicare coverage of items and services. These policies can be set forth in regulations, manual instructions, national coverage determinations, local coverage determinations, bulletins to providers, and other educational materials.

**Factual Background**

12. VisionQuest was founded in 1989 and is a leading provider of noninvasive medical solutions focused on bone, joint, and soft-tissue conditions. Services include in-home patient fitting of braces and medical devices, technology-enabled compliance monitoring, and around-the-clock patient care.

13. VisionQuest, including their manufacturing facilities, are based in California. VisionQuest also maintains field locations nationwide.

14. VisionQuest is licensed in multiple states including by the California Department of Health Services as a medical device retailer and manufacturer.

15. VisionQuest is also registered with the U.S. Food and Drug Administration as a medical device manufacturer and specification developer.

16. VisionQuest follows stringent federal guidelines for manufacturing, inspection, handling, storage, distribution and delivery of controlled medical devices to patients. These federal regulations help ensure safety and efficacy for patients and the community.

17. VisionQuest was founded on a patient-centered business model. This means that VisionQuest advocates for the best products, services and care for the patients they serve.

18. In conformance with their rigorous ethical and legal standards, VisionQuest's corporate governance program is overseen by a corporate compliance officer and includes strictly enforced employee compliance guidelines, a Code of Ethics, and a comprehensive employee training program. VisionQuest considers its independent corporate governance program among the most comprehensive in the industry.

**Medicare Coverage for Durable Medical Equipment, Prosthetics, Orthotics and Supplies**

19. Medicare coverage guidelines for durable medical equipment, prosthetics, orthotics and supplies ("DMEPOS") are set forth in the Medicare statute, the Code of Federal Regulations, Chapter 20 of the Medicare Benefit Policy Manual ("MBPM"), LCD L33318, Policy Article A52465 and other assorted subregulatory guidelines.

20. The Medicare statute requires that all items or services furnished by providers to beneficiaries be medically reasonable and necessary for the treatment of an illness or injury or to improve the functioning of a malformed body member.

21. At all times relevant hereto, CMS contracted with two DME MACs to process and pay Medicare Part B claims for DMEPOS, including orthotic braces. Each DME MAC processes claims for two of four jurisdictions (A, B, C, and D), which includes specific states and territories.

22. DME MACs develop local coverage determinations ("LCDs") for some covered orthotic braces. These LCDs outline the conditions under which DME MACs will pay suppliers for those braces.

23. The primary orthotic at issue in this appeal consists of knee orthoses.

24. Under Medicare guidelines applicable nationwide, knee orthoses represented by HCPCS codes L1832, L1833, L1843, L1845, L1851 (formerly HCPCS code K0901), and L1852 (formerly HCPCS code K0902) are covered for a beneficiary who is ambulatory and has knee instability due to a condition specified in the Group 4 Codes in the "ICD-10 Codes that are Covered" section of the LCD-related Policy Article. Knee instability must be documented by examination of the beneficiary and objective description of joint laxity (e.g., varus/valgus instability, anterior/posterior Drawer test). Knee orthoses may also be covered for a beneficiary who has had a recent injury to or a surgical procedure on the knee(s).

25. Custom fabricated knee orthoses represented by HCPCS codes L1834, L1840, L1844, L1846, and L1860 are covered for an ambulatory beneficiary who has a documented physical characteristic that requires the use of a custom fabricated orthosis instead of a prefabricated orthosis. Examples of situations that meet the criteria for a custom fabricated orthosis include but are not limited to: (1) deformity of the leg or knee; (2) size of thigh and calf; and (3) minimal muscle mass upon which to suspend an orthosis. If a custom fabricated orthosis is provided, but the medical record does not document why it is medically necessary instead of a prefabricated orthosis, then the custom fabricated orthosis will be denied as not reasonable and necessary.

### Statistical Sampling for Overpayment Estimation

26. Due to the extraordinarily high volume of claims processed by CMS' contractors each year, it is in most cases not feasible or practical for CMS or its contractors to perform post-payment audits of individual claims. CMS has accordingly authorized its contractors to utilize statistical sampling to project or "extrapolate" overpayments to providers upon review of a statistically valid sample of a provider's claims.

27. At the time the audit in this case was performed, Medicare guidelines for statistical sampling and overpayment estimation were set forth in Chapter 8 of the Medicare Program Integrity Manual ("MPIM").

28. According to Chapter 8, section 8.4.1.3 of the MPIM, the major steps in conducting statistical sampling include: (1) selecting the provider or supplier; (2) selecting the period to be reviewed; (3) defining the universe, the sampling unit, and the sampling frame; (4) designing the sampling plan and selecting the sample; (5) reviewing each of the sampling units and determining if there was an overpayment or an underpayment; and, as applicable, (6) estimating the overpayment.

29. For purposes of extrapolation, the "universe" of a provider's Medicare claims consists of all claims submitted by the provider within the chosen time period. Consistent with the nature and scope of a given audit, certain limiting criteria are then applied to the universe; an example of a limiting criterion would be claims submitted for a certain procedure or service.

30. Following application of the limiting criteria to the universe, the resulting set of data is called the "sampling frame." The sampling frame is an ordered list of all of the possible sampling units. The sampling units, which are the elements that will be selected for review during a post-payment audit, can be beneficiaries, claims, or individual services.

31. The sampling units are chosen randomly from the frame through use of a computer program, such as RAT-STATS, which is software developed by the Office of Inspector General of the United States Department of Health and Human Services. A user initializes one of these programs by supplying a "seed value" (i.e., a positive integer) from which a sequence of random numbers is then generated.

32. In cases where the sampling unit is the claim, the random numbers produced by the computer algorithm are then matched with the position numbers of the claims in the sampling frame. The claims matched with the random numbers generated by the computer program are chosen to serve as the claims comprising the statistical sample.

33. Once the sample is constructed, each sampling unit is audited by medical review staff members. The medical reviewer may determine that a claim was correctly paid, incorrectly paid, or that it should have been paid at a different amount from that which was originally paid to the provider.

34. During the medical review process, any sampling units that are found to be underpayments, in whole or in part, will be recorded as "negative" overpayments and must be used in the calculation of the estimated overpayment.

35. Upon completion of the medical record review, staff will calculate the net amount by which the provider was overpaid for the sampled claims. This actual overpayment amount is then projected to the universe of that provider's claims to form the extrapolated overpayment amount.

36. Medicare contractors are required to maintain complete documentation of the sampling methodology that is utilized in each case. This documentation includes, but is not limited to, the universe file, the sampling frame, sample design documents, and a log of the computer program session used to generate the random numbers.

37. When sampling for the purposes of extrapolation, Medicare contractors are required to draw a statistically valid sample and utilize only statistically valid methods to project an overpayment.

38. Medicare contractors have the discretion to select the sample design to be used in

a particular case. According to the MPIM, the most common types of sample designs include simple random sampling, stratified random sampling, and cluster sampling.

39. Irrespective of the sample design chosen by the contractor's statistician, that design must be properly executed in order for the methodology and resulting overpayment projection to be statistically valid.

40. Medicare contractors are required to maintain sufficient documentation so as to enable an independent statistician to recreate the frame, the sample, and the overpayment estimate for an audit.

41. The inability to replicate the frame, sample, or an overpayment estimate derived therefrom renders the sampling methodology statistically invalid.

### Payment for Non-Covered Services and Waiver of Recoupment

42. In cases where CMS or its contractor determines that an item or service is not reasonable and necessary, section 1879 of the Medicare statute, codified at 42 U.S.C. § 1395pp, provides that payment shall nevertheless be made for such items or services if the provider did not know, nor could it have reasonably been expected to know, that such items or services would not be covered.

43. In the event that CMS determines a provider has been overpaid and that payment may not be made in accordance with the liability limitations discussed in paragraph 36, the Medicare statute at section 1870, codified at 42 U.S.C. § 1395gg, allows for waiver of recoupment of the overpayment.

44. Recoupment of an overpayment may be waived under section 1870 of the Medicare statute where the provider is deemed to be "without fault" in causing the overpayment.

45. A provider is considered to be at fault as to the creation of an overpayment, and thus ineligible for waiver of recoupment of the overpayment, where it knew or should have known that the services at issue were not covered by Medicare.

### The Medicare Administrative Appeals Process

46. If a Medicare contractor audits and denies a claim or extrapolates an overpayment upon review of a statistical sample of claims, the affected provider may avail itself of an administrative appeal process to contest the claim denial(s) and / or the validity of the contractor's sampling methodology. This appeals process consists of five stages: redetermination, reconsideration, a hearing before an Administrative Law Judge ("ALJ"), review by the Council, and judicial review in Federal District Court.

47. Requests for redetermination are processed by MACs. Requests for reconsideration are handled by separate contractors known as Qualified Independent Contractors ("QICs"). Hearing requests are adjudicated by ALJs in the Office of Medicare Hearings and Appeals ("OMHA"). Requests for Council review are processed by the Council, which responsible for issuing the final agency decision as to Medicare reimbursement disputes on behalf of the Secretary.

### Procedural Background

48. In August of 2018, OIG sent a letter to VisionQuest stating its intention to audit Medicare payments made to VisionQuest for durable medical equipment, prosthetics, orthotics and supplies ("DMEPOS") with dates of service from January 1, 2016 through May 31, 2018. An Excel chart listing 100 Medicare beneficiaries for which OIG was seeking records was provided. VisionQuest promptly retrieved and produced the documentation within five days as requested.

49. In September 2019, VisionQuest engaged an independent statistician, Ross Mitchell Cox, Ph.D. ("Dr. Cox") to review OIG's sampling methodology.

50. Dr. Cox determined that OIG's methodology was statistically invalid and explained the bases for his conclusion in a report dated October 11, 2019. In October 2019, VisionQuest submitted a copy of Dr. Cox's report to OIG in response to their Draft Report.

51. Dr. Cox determined that OIG's sample failed samptest, a computer simulation used to evaluate sampling plans. Samptest showed that the two-sided confidence level of OIG's overpayment estimate fell as low as 83.9%. OIG therefore had not satisfied its own requirement that its reimbursement demand be the lower bound of a two-sided 90% confidence interval. Dr. Cox found that OIG's failure to satisfy these requirements was a direct result of its failure to follow its own sampling guidelines.

52. Dr. Cox also determined that OIG did not provide enough information to re-create the sampling frame or sample.

53. Finally, Dr. Cox concluded that OIG biased its overpayment estimate upward by removing potential underpayments from its sampling frame.

54. Dr. Cox determined that OIG's extrapolation was invalid for any one of his conclusions either on its own or in combination with others.

55. In August 2020, OIG published its audit results. For purposes of this appeal, OIG denied 67 claims across DME MAC Jurisdictions B, C, and D. OIG further asserted that the claims it had reviewed constituted a statistically valid random sample of Plaintiff's Medicare claims. OIG therefore extrapolated an alleged overpayment and estimated that VisionQuest received at least $2.5 million in unallowable Medicare payments for orthotic braces.

56. In August of 2020, Noridian Healthcare Solutions, LLC. ("Noridian"), the Jurisdiction D DME MAC demanded an extrapolated alleged Medicare overpayment of $1,733,150.16.

57. Dr. Cox addressed OIG's comments in its Final Report related to the sampling methodology in an expert response dated November 6, 2020.

58. VisionQuest thereafter sought redetermination of the alleged overpayment with Noridian, which was the MAC charged with conducting such appeals at the time. The resulting redetermination decision was unfavorable to VisionQuest.

59. The original redetermination decision dated November 18, 2020, incorrectly alleged that the Appellant did not make any specific challenges to the statistical sampling. In this decision, Noridian made no reference to nor acknowledged either Dr. Cox's October 11, 2019 expert report or the November 6, 2020 expert response to OIG's final report.

60. A corrected redetermination decision was issued in December 2020. In the corrected redetermination decision, Noridian failed to even discuss the statistical sample.

61. In February of 2021, VisionQuest filed a request for reconsideration of the alleged overpayment with the responsible QIC, MAXIMUS Federal Services ("MAXIMUS"). The QIC later rendered a corrected partially favorable notice of reconsideration dated August 23, 2021. In this decision, MAXIMUS upheld the validity of the statistical sampling. However, MAXIMUS also failed to acknowledge that either of Dr. Cox's expert opinions or the expert opinion prepared by Dr. Moody, Chief Statistician for CGS, had been reviewed or considered.

62. Dr. Cox prepared an expert response dated October 1, 2021, to Ms. Cindi Williamson's explanation validating the sampling methodology on behalf of MAXIMUS.

63. VisionQuest then submitted a request for a hearing before an ALJ. As part of its appeal request, VisionQuest contested the remaining claim denials, the statistical validity of OIG's sampling methodology, and the contractors' determinations that it was liable and at fault for causing the overpayment according to sections 1879 and 1870(b) of the Social Security Act,

respectively. Copies of Dr. Cox's October 11, 2019 expert report, November 6, 2020 expert response to OIG's final report, and October 1, 2021 response to MAXIMUS' reviewer were provided to the ALJ. In addition, a copy of the expert report prepared by CGS' Chief Statistician, Dr. Moody, invalidating the statistical sampling used in this case was provided as well.

64.  ALJ Joseph Petrylak conducted an evidentiary hearing by telephone in January of 2023. Dr. Cox testified on behalf of VisionQuest and elaborated on the basis for his determination that the sampling methodology was invalid. The ALJ then issued a partially favorable decision in March of 2023. In his decision, ALJ Petrylak determined that the statistical sampling and extrapolation methodologies utilized by the OIG were invalid.

65.  In May of 2023, CMS, acting through its contractor, referred ALJ Petrylak's decision to the Council for potential review on its own motion pursuant to 42 C.F.R. § 405.1110(b).

66.  In June of 2023, VisionQuest, acting through legal counsel, also sought review of ALJ Petrylak's decision by the Council. As part of its appeal request, Plaintiff contested the denial of the DMEPOS claims and the ALJ's conclusion that it was at fault and liable for the overpayment.

67.  The Council issued a decision dated August 24, 2023. As part of this decision, the Council determined that the extrapolation and statistical sampling methodologies were proper. In addition, the Council affirmed all of the claim denials and determined that VisionQuest was at fault and liable for the overpayment.

68.  The Council's decision dated August 24, 2023, constitutes the final agency decision in this matter pursuant to 42 U.S.C. § 1395ff(b). Plaintiff has thus exhausted its administrative remedies, and this case is eligible for judicial review.

69. Concurrently with this matter, VisionQuest received two demand letters from CGS Administrators, LLC ("CGS"), the Jurisdictions B and C DME MACs which demanded extrapolated Medicare overpayments of $76,129.43 and $49,350.41.

70. VisionQuest thereafter sought redetermination of both of the alleged overpayments with CGS, which was the MAC charged with conducting such appeals for Jurisdictions B and C at the time.

71. CGS issued the redetermination decisions for both the Jurisdiction B and C appeals in December 2020. In both cases, CGS stated "A statistical analysis was conducted on the sampling methodology and overpayment calculation pertaining to the Office of Inspector General (OIG)'s original overpayment amount. The Chief Statistician indicated the results of the review did not support a valid sample. The estimated overpayment will be recalculated."

72. The memorandum drafted by Dr. Suzanne Moody, Ph.D., Chief Statistician at CGS stated: "Over the last 21 years, I have designed the sampling methodology used to establish financial loss in hundreds of Medicare cases and served as a statistical expert witness in criminal, civil, and administrative litigation. I have reviewed sample selections and extrapolations for validity and performed the sample selection and statistical extrapolation in hundreds of cases, as well."

73. Regarding OIG's statistical sample, Dr. Moody stated that this "case involves a single universe of claims that was sampled. The extrapolated overpayment amount was divided proportionally among the four DME MAC jurisdictions, A, B, C, and D, with CGS holding the contracts for JB and JC. Although the provider has appealed the overpayment amount for each of the jurisdictions separately, the validation of the sampling and extrapolation must be done at the combined level."

74. Dr. Moody reviewed the report prepared by Appellant's statistical expert, Dr. Cox, and stated that she found several arguments for which she concurred, though perhaps, for different reasons. In particular, she found the information provided by the OIG to be insufficient to replicate the sample pull. Therefore, the extrapolation was invalidated and the overpayments to be recovered by CGS were reduced to the unallowable amounts of the claims.

75. Based on Dr. Moody's expert report, CGS issued a redetermination decision confirming that the statistical sampling in this matter was invalid. As noted by Dr. Moody, the validation of the sampling and extrapolation must be done at the combined level. Therefore, this determination also applies to the extrapolation performed in the DME MAC Jurisdiction D included in this appeal.

### Count I – Statistical Sampling Methodology and Extrapolation

76. Plaintiff hereby incorporates by reference paragraphs 1 through 76 herein.

77. The Council's decision does not correctly apply the relevant legal standards and is unsupported by substantial evidence because it upholds the use of extrapolation where the methodology does not satisfy Medicare requirement for statistical sampling.

### Count II – Medicare Coverage for DMEPOS

78. Plaintiff hereby incorporates by reference paragraphs 1 through 78 herein.

79. The final agency decision does not correctly apply the relevant legal standards and is unsupported by substantial evidence because the Council concluded the remaining denied claims did not meet Medicare coverage requirements for DMEPOS.

### Count III – Payment for Denied Services

80. Plaintiff hereby incorporates by reference paragraphs 1 through 80 herein.

81. The Council's decision does not correctly apply the relevant legal standards and is unsupported by substantial evidence because it found that Plaintiff is not entitled to payment for the denied services under section 1879 of the Social Security Act.

### Count IV – Waiver of Recoupment of the Overpayment

82. Plaintiff hereby incorporates by reference paragraphs 1 through 82 herein.

83. The Council's decision does not correctly apply the relevant legal standards and is unsupported by substantial evidence because it found that Plaintiff is not entitled to waiver of recoupment of the overpayment according to section 1870(b) of the Social Security Act.

### Prayer for Relief

WHEREFORE, Plaintiff respectfully requests that this Court:

84. Reverse the Council's decision that the sampling methodology used by the contractor to extrapolate the alleged overpayment was statistically valid; the remaining denied claims did not meet Medicare coverage criteria; and / or that Plaintiff did not qualify for payment of the excluded services or waiver of recoupment of the overpayment in accordance with the relevant provisions of the Social Security Act;

85. Vacate the Council's decision and remand the case for further proceedings;

86. Grant to Plaintiff any other legal or equitable relief that the Court may deem just and proper.

                                      Respectfully Submitted,

Dated: October 23, 2023                      */s/ Nicholas Jurkowitz*
                                                  Nicolas Jurkowitz (CBN: 261283)
                                                  **FENTON LAW GROUP, LLP**
                                                  **1990 SOUTH BUNDY DRIVE, STE. 777**
                                                  **LOS ANGELES, CA 90025]**
                                                  **TEL: (310) 444-5244**
                                                  **FAX: (310) 444-5280**
                                                  **NJURKOWITZ@FENTONLAWGROUP.COM**
                                                  **Attorneys for Plaintiff**

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this 23th day of October 2023, the foregoing Plaintiff's Complaint for Judicial Review was served via USPS certified mail, return receipt requested, on the following:

Samuel Bagenstos
c/o General Counsel
U.S. Department of Health and Human Services
200 Independence Avenue, S.W.
Washington, D.C. 20201

Merrick Garland
Attorney General of the United States
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-0001

E. Martin Estrada, Acting U.S. Attorney
Central District of California
312 North Spring Street, Suite 1200
Los Angeles, California 90012


/s/ Nancy Natelsky
Nancy Natelsky